[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15368
Non-Argument Calendar
_____

D.C. Docket No. 5:13-cv-00085-RS-GRJ

A. L., *et al.*,

Plaintiffs - Appellants,

versus

JACKSON COUNTY SCHOOL BOARD,

Defendant - Appellee,

LEE MILLER, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(December 30, 2015)

Before JORDAN, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

P.L.B. is the mother of A.L., a student who received special-education services from the Jackson County School Board (the "Board"). P.L.B. and A.L. appeal the district court's final judgment in favor of the Board denying their claims under the Individuals With Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* (the "IDEA"), Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("Section 504"), the Americans with Disabilities Act, 42 U.S.C. §§ 12101, *et seq.* (the "ADA"), and the Fourth Amendment of the United States Constitution.

We affirm the district court's entry of summary judgment in favor of the Board on Appellants' IDEA claims and their Section 504 and ADA claims. We reverse and remand for further proceedings on the Fourth Amendment claim.

## I.

The IDEA was enacted, in part, "to ensure that all children with disabilities have available to them . . . a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment and independent living." 20 U.S.C. § 1400(d). Under the IDEA, state and local educational agencies may receive federal assistance if they have in place policies and procedures designed to ensure that they provide a free appropriate public education ("FAPE") to students with disabilities. *CP v. Leon Cty. Sch. Bd. Fla.,* 483 F.3d 1151, 1152 (11th Cir. 2007); 20 U.S.C. § 1412. Satisfying the IDEA's duty to provide a FAPE requires

2

the state or local educational agency to offer "'personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'"  *CP,* 483 F.3d at 1152 (quoting *Bd. of Educ. of Hendrick Cent. Sch. Dist. v. Rowley,* 458 U.S. 176, 203, 102 S. Ct. 3034, 3049 (1982)).

To carry out the objectives of the IDEA, procedural safeguards have been put into place to allow for parental involvement in matters concerning their child's education.  These safeguards also allow parents to obtain administrative and judicial review of decisions they believe to be unsatisfactory or inappropriate.  *See N.B. by D.G. v. Alachua Cty. Sch. Bd.*, 84 F.3d 1376, 1378 (11th Cir. 1996).

Among other things, the IDEA requires schools and parents together to develop an individualized education program ("IEP") that addresses the child's unique needs.  *See RL v. Miami–Dade Cty. Sch. Bd.,* 757 F.3d 1173, 1177 (11th Cir. 2014).  An IEP, in turn, is a

> written statement that describes the child's academic performance and how the child's disability affects her education, states measurable educational goals and special needs of the child, establishes how the child's progress will be measured and reported, and states the services available, based on peer-reviewed research, to enable the child to attain the goals, advance educationally, and participate with disabled and nondisabled children.

*K.A. ex rel. F.A. v. Fulton Cty. Sch. Dist.,* 741 F.3d 1195, 1201 (11th Cir. 2013) (citing 20 U.S.C. § 1414(d)(1)(A)(i)).  The IEP is meant to be the "culmination of a

collaborative process between parents, teachers, and school administrators, outlining the student's disability and his educational needs, with the goal of providing the student with a [FAPE]." *RL,* 757 F.3d at 1177. (citations omitted).

While the IEP should be "reasonably calculated to enable a child to receive educational benefits," *RL,* 757 F.3d at 1177 (citations omitted), the IDEA does not require an IEP to maximize the potential of each child with a disability comparable to the opportunity provided to children without a disability. *Rowley,* 458 U.S. at 200, 192 S. Ct at 3048. Nor does the IDEA require an IEP to meet "any particular substantive educational standard." *Id.* Instead, the student with a disability must receive "personalized instruction with sufficient support services to permit the child to benefit educationally." *Id.* The IDEA requires that the IEP team reviews the IEP at least annually to determine whether the goals of the child are being met. 20 U.S.C. § 1414(d)(4)(A).

If the child's parents are dissatisfied with the IEP (or any other aspect of their child's educational program) and believe that it does not comply with the IDEA's requirements, they may file a complaint with the state administrative agency. *RL,* 757 F.3d at 1177. During this process, the parents receive a due-process hearing before an administrative law judge or hearing officer to resolve the dispute. *Id.;* 20 U.S.C. § 1415(f)(1)(A). If either party disagrees with the outcome of the due-process hearing, that party may appeal the decision by filing suit in state

court or in the United States District Court.  *RL,* 757 F.3d at 1178; 20 U.S.C. § 1415(i)(2)(A).

## II.

A.L. suffers from a traumatic brain injury and is an individual with a disability who was entitled to receive special-education services.  Beginning in 2001, the Board identified A.L. as a child with a disability and began providing various services to A.L. in order to meet its duties under the IDEA.  Over the years, P.L.B. claimed, among other things, that the Board violated the IDEA by (1) failing to include her in a November 17, 2010, IEP development meeting; (2) failing to meet her demand to provide A.L. with an independent educational evaluation; and (3) failing to provide A.L. with special-education services during the summer months.  P.L.B. also complained that the Board discriminated against A.L. in various ways based upon his disability and also retaliated against her son when she complained about instances of discrimination.

On March 15, 2011, P.L.B. requested a due-process hearing with the Florida Division of Administrative Hearings ("DOAH") so that her claims could be heard.  In that filing, P.L.B. attempted to raise claims for the previous five years.  In response, the Board filed a motion to strike what it perceived to be time-barred claims—instances that fell outside the period two years preceding the filing of the claims.  The administrative law judge ("ALJ") handling the case partially granted

5

the motion to strike, limiting the claims to those accruing between November 24, 2008, and November 24, 2010.

A six-week hearing before the ALJ commenced in September 2011 and concluded in April 2012. By the time the hearing was completed, the ALJ had heard from over 60 witnesses and received more than 160 exhibits. The ALJ entered a lengthy final order on December 27, 2012, denying all of P.L.B.'s claims. As a result of the denial of her claims, P.L.B. filed a complaint in the Northern District of Florida on March 27, 2013. A.L. was added as a named party in 2014 after he turned eighteen.

After various amendments to their claims, Appellants filed their Third Amended Complaint asserting claims under the IDEA, Section 504, the ADA, and the Fourth Amendment of the Constitution. Pursuant to prior rulings by the district court, the Third Amended Complaint advanced claims only from November 24, 2008, through November 24, 2010. Following the completion of discovery, the Board filed a motion for summary judgment. At that time, Appellants did not file a dispositive motion. Instead, they sought a motion for extension of time to file their motion for summary judgment. The district court later entered an order instructing the Board to amend its motion for summary judgment and extending the time for Appellants to file their dispositive motion. This deadline was subsequently extended until August 26, 2014.

On August 26, 2014, the Board filed its Amended Motion for Summary Judgment, seeking judgment in its favor on all of the counts in the Third Amended Complaint. Appellants filed their partial motion for summary judgment on August 28, 2014, but they asked for additional time to amend it.

After granting several of Appellants' requests for additional time to respond to the Board's motion and to amend their own motion—some that Appellants did not seek until after they had already missed filing deadlines, the court finally warned Appellants that it would provide no further extensions, and everything must be filed by October 2, 2014. Despite this, Appellants did not file an amended motion for partial summary judgment[1] until October 6, 2014, and they yet again sought an extension of time until October 31, 2014, to file the remainder of their motion for summary judgment. As for their response to the Board's summary-judgment motion, Appellants never filed a response to that. Rather, they filed a motion for extension of time. The district court denied the request, stating that Appellants' "seemingly unending requests for extensions is contrary to the policy of resolving disputes in a timely manner."

On October 30, 2014, the district court granted summary judgment to the Board on all counts. Although Appellants had not filed a response to the Board's Amended Motion for Summary Judgment, the district court explained, "To the

_____

[1] Appellants sought summary judgment on their IDEA and Fourth Amendment claims but not on their Section 504 and ADA claims.

7

extent that it can be so construed, I consider [Appellants'] own motion for partial summary judgment to be a response." The district court addressed the claims advanced by Appellants and denied each in turn.

### III.

District court decisions interpreting the IDEA are subject to *de novo* review. *Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1313 (11th Cir. 2003).

We also review *de novo* an appeal from an order granting summary judgment in non-IDEA cases and apply the same legal standards that control the district court. *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1310 (11th Cir. 2013); *Babicz v. Sch. Bd. of Boward Cty.*, 135 F.3d 1420, 1421 (11th Cir. 1998). Rule 56(a), Fed. R. Civ. P., provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." We view all evidence most favorably towards the nonmoving party, and all justifiable inferences are drawn in the nonmoving party's favor. *Scantland*, 721 F.3d at 1310.

### IV.

A. **The District Court Did Not Err in Granting Summary Judgment in Favor of the School Board With Respect to Appellants' IDEA Claims**

As noted previously, Appellants contend that the Board violated provisions of the IDEA by (1) failing to include P.L.B. in a November 17, 2010, IEP development meeting; (2) failing to meet P.L.B.'s demand to provide A.L. with an

8

independent educational evaluation; and (3) failing to provide A.L. with services during the summer months.  We disagree and address each argument in turn.

### 1.  November 17, 2010, IEP Meeting

Parent participation in the IEP process is important to effectuating the purpose of the IDEA.  *See* 20 U.S.C. § 1414(d)(1)(B)(i) (requiring inclusion of parents in the IEP team).  The IDEA itself and its implementing regulations memorialize the importance of this participation.  Indeed, 34 C.F.R. §300.322, entitled "Parent Participation," generally provides that a school board must take steps to ensure that one or both parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate.  *See* 34 C.F.R. § 300.322(a).  Moreover, the Supreme Court has emphasized that the IDEA's structure relies upon parent participation in developing successful IEPs.  *Rowley*, 458 U.S. at 206, 102 S. Ct. 3034 ("Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, as it did upon the measurement of the resulting IEP against a substantive standard.").

Although parent participation in the development of IEPs is important, the IDEA's implementing regulations provide for instances in which a school board may conduct an IEP meeting in the absence of the parent.  Specifically, 34 C.F.R. §300.322(d) states,

9

(d) Conducting an IEP Team meeting without a parent in attendance. A meeting may be conducted without a parent in attendance if the public agency is unable to convince the parents that they should attend. In this case, the public agency must keep a record of its attempts to arrange a mutually agreed on time and place, such as—

(1) Detailed records of telephone calls made or attempted and the results of those calls;

(2) Copies of correspondence sent to the parents and any responses received; and

(3) Detailed records of visits made to the parent's home or place of employment and the results of those visits.

34 C.F.R. § 300.322(d). So if a parent refuses to attend an IEP meeting or takes actions that are equivalent to refusing to attend an IEP meeting, the school board may hold the meeting without the parent in order to develop the child's IEP. *Id.*

Here, the Board conducted an IEP development meeting on November 17, 2010, without P.L.B. present. P.L.B. claims that the completion of this meeting without her violated the IDEA and resulted in a denial of a FAPE to A.L. We disagree.

Although P.L.B. did not explicitly refuse to attend the November 17, 2010, IEP meeting, her actions were tantamount to refusal. The Board attempted to schedule the IEP meeting over several months, with notification to P.L.B. so that she could participate in the process. The attempts to schedule a meeting for the development of A.L.'s IEP began in early August 2010 and continued through

10

mid-November. During this period, despite the Board's efforts to accommodate P.L.B.'s schedule and demands, P.L.B. either missed or refused to consent to attending four separately scheduled meetings, including the last one, scheduled for November 17, 2010.

On that morning, P.L.B. sent the Board an e-mail indicating that she could not attend the meeting because she was sick. She once again asked the School Board to reschedule the IEP meeting. Although the principal responded that the IEP meeting would proceed as planned due to A.L's "urgent academic and emotional needs," the Board offered to allow P.L.B. to attend the IEP meeting by telephone, as she had done in the past. P.L.B. refused.

The Board faced the dilemma of allowing the IEP meeting to be continued indefinitely or proceeding with the meeting without parent participation. While parent participation in developing a child's IEP is certainly an important goal of the IDEA, in this case, A.L.'s specific educational goals stagnated because of P.L.B.'s seemingly endless requests for continuances of the meetings scheduled by school personnel. Under these circumstances, the Board did not violate the IDEA when it proceeded with the November 17, 2010, IEP meeting in P.L.B.'s absence. And the district court did not err when it concluded that the Board met its obligations under the IDEA with respect to the November 17, 2010, IEP meeting.

We also find inapposite Appellants' reliance on *Doug C. v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1044 (9th Cir. 2013).  First, it is not binding on us.  Second, even if it were, the facts of *Doug C.* are materially distinguishable from those of the instant case.

For one thing, the IEP meeting that took place in *Doug C.* was completed in order to meet the IDEA's requirement that an IEP be completed annually.  Unlike here, nothing in *Doug C.* suggests that the student was struggling in school or that other circumstances warranted the immediate development of an IEP. In addition, the IEP meeting in *Doug C.* was rescheduled only twice over a month's time.  And more significantly, the reason that the department of education refused to reschedule in *Doug C.* was out of concern for disrupting the other IEP team members' schedules.  Here, though, it was P.L.B. who caused all of the delays and rescheduling.  Moreover, the Board refused to rescheduled again out of concern for A.L., not because rescheduling was inconvenient for team members.

The IEP meeting in *Doug C.* was also conducted outside the presence of the parent *and* the only IEP team member who was on the staff of the student's school. Here, nobody was absent at the November 17, 2010, meeting except for P.L.B., who had previously refused to attend scheduled IEP meetings.  And, unlike the situation in *Doug C.*, P.L.B. provided the School Board with a parent-proposed IEP ("PPIEP") before the meeting, which the IEP team considered when it went

12

forward with the November 17, 2010, IEP meeting.  In *Doug C.*, the department of education changed the student's school placement without his father's input.  Here, no such drastic change resulted from the IEP meeting.

Finally, while the Ninth Circuit found the department of education's actions in *Doug C.* to be unreasonable, it nonetheless recognized that circumstances could arise in which "accommodating a parent's schedule would do more harm to the student's interest than proceeding without the parent's presence at the IEP."  *Id.*

Here, the Board made a reasonable determination about the course of action least likely to result in denial of a FAPE.  We therefore affirm the district court's grant of summary judgment in favor of the Board with respect to this claim.

### 2.  The Board Did Not Violate the IDEA With Respect to P.L.B.'s Request for an Independent Educational Evaluation

The IDEA provides parents with the right to obtain an independent educational evaluation ("IEE") at the expense of the local education agency.  *See* 34 C.F.R. §300.502(a).  An IEE is an evaluation conducted by a qualified examiner who is not employed by the public agency.  *Id.*  The regulation provides, in relevant part, as follows:

> Each public agency must provide to parents, upon request for an independent educational evaluation, information about where an independent educational evaluation may be obtained, and the agency criteria applicable for independent educational evaluations as set forth in paragraph (e) of this section.

***

> (e) If an independent educational evaluation is at public expense, the criteria under which the evaluation is obtained, *including the location of the evaluation and the qualifications of the examiner*, must be the same as the criteria that the public agency uses when it initiates an evaluation, to the extent those criteria are consistent with the parent's right to an independent educational evaluation.

34 C.F.R. § 300.502 (emphasis added). When presented with a request for an IEE, an agency must either ensure that an IEE is provided at public expense or file a due-process complaint to request a hearing to show that its own evaluation is appropriate. *See* 34 C.F.R. § 300.502(b)(2). Here, the Board took reasonable steps to ensure that an IEE took place, but P.L.B.'s own actions caused the IEE process to fail. Accordingly, we agree with the district court's finding that the School Board did not violate the IDEA with respect to the provision of an IEE.

In the spring of 2009, P.L.B. requested an IEE at the Board's expense. When P.L.B. finally chose an evaluator, his fee was $1,500 more than the approved fee. Nonetheless, the Board agreed to cover the fee. Then P.L.B. insisted that the evaluation be conducted by a different evaluator at the Morris Center, a facility 200 miles away. The Board declined that demand, noting the high expense and the availability of closer, appropriate facilities. Although P.L.B. relented and agreed to have the IEE performed by an evaluator located closer, she did not have the evaluation done. Instead, more than two years later, during the

summer of 2012, P.L.B. took her son to Colorado to be evaluated by a doctor from the Morris Center who had since moved.[2]

Under these circumstances, the Board did not deny Appellants an IEE. Rather, we concur with the well-reasoned decision of the ALJ, as adopted by the district court, that P.L.B.'s actions sabotaged the IEE process. *See Loren F. v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1314 n.5 (11th Cir. 2003) (findings of fact made by the ALJ are considered prima facie correct and are entitled to deference).

Nor did the Board's refusal to pay for an IEE at the Morris Center violate the requirements of the IDEA. The Board complied with the requirements of 24 C.F.R. § 300.502 by making available an IEE at its own expense by a qualified provider within the relevant geographic area and within monetary limits that were more than reasonable.

To the extent that Appellants assert that the Board was required to either consent to an evaluation at the Morris Center or file for a due-process hearing, we disagree and find that Appellants' citation to *OSEP Letter to Parker* (Feb. 20, 2004)[3] does not require this result. Neither situation covered by 34 C.F.R.

---

[2] Appellants suggested for the first time in their Motion for Partial Summary Judgment that the evaluation conducted during the summer of 2012 was an IEE. But the evaluation was appears to have been obtained for use in litigation based on the timing of the evaluation and the fact that Appellants listed the doctor who conducted the evaluation as their expert witness during the district court proceedings.

[3] The United States Department of Education, Office of Special Education Programs ("OSEP") is the federal agency charged with the administration, interpretation, and enforcement of the IDEA.

300.502(b) is present here because the School Board ensured that an appropriate IEE was provided at public expense. It was P.L.B. who refused to follow through. The Board was not required to give in to the unreasonable demands of the parent when a suitable local evaluator was available. The Morris Center did not meet the reasonable criteria of the Board, and the district court did not err in finding no violation of the IDEA.

### 3.  The Board Did Not Fail to Provide Extended Year Services

Finally, Appellants contend that the Board failed to provide extended school year services ("ESY") when it assigned A.L. to the Jackson Alternative School in the summer of 2009 because the school did not offer a "regular school environment." In other words, Appellants claim that the School Board violated the IDEA by failing to place A.L. in the least restrictive environment. Appellants note that the Jackson Alternative School, to which A.L. was assigned, had a policy of conducting routine searches of its students because many exhibited behavioral problems. Since A.L. did not have behavioral issues, Appellants argue that he was not placed in the least restrictive environment.

We find that the district court correctly determined that the Board provided sufficient extended school year services in compliance with the IDEA because it met the requirements of 34 C.F.R. § 300.106 by assigning A.L. to an alternative school during the summer of 2009.

16

A public school must provide ESY if a child's IEP team determines that such services are necessary for the student to receive a FAPE.  *See* 24 C.F.R. § 300.106.  Generally speaking, services and instruction provided by an IEP must be "to the maximum extent appropriate," in the least restrictive environment.  *See* 20 U.S.C. § 1412(A)(5)(a).  This requirement expresses a preference for disabled children to be educated together with their non-disabled peers.  Although we have not yet concluded that ESY placements must be made in the least restrictive environment in the summer, we recognize that the Second Circuit recently made this conclusion.  *See T.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 162 (2d Cir. 2014).  But the Second Circuit also found that the least-restrictive-environment requirement is not absolute.  *Id.*

Assuming without deciding that the Board was required to place A.L. in the least restrictive environment for ESY, we find that Appellants failed to demonstrate that such placement was not made.  As noted by the Second Circuit in *T.M.*, a disabled student's least restrictive environment refers to "the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available."  *Id.*  (citation omitted).  In order to comply with the least-restrictive-environment requirement for the ESY, a school district "must consider an appropriate continuum of alternative placements, and then must offer the student the least restrictive placement from

that continuum that is appropriate for the student's disabilities." *Id.* The IDEA does not require a school board to create a mainstream summer program to serve the needs of one disabled student. *Id.* (citing *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000) and *Reusch v. Fountain*, 872 F. Supp. 1421, 1438 (D. Md. 1994)). Indeed, the IDEA "does not require public school districts to create any new ESY programs that they do not currently operate. It is entirely up to each state and each school district to decide how it will fulfill the IDEA's [least restrictive environment] requirement." *Id*.

Appellants provide no concrete reasons why the ESY program fell outside statutory compliance except for the fact that A.L. was uncomfortable with the routine searches that were conducted. While we can appreciate A.L.'s discomfort with routine searches, this allegation, without more, was not enough for the district court to find that the Alternative School was not the least restrictive environment for A.L. during the summer months. The Alternative School was the only location providing ESY services in the summer of 2009, and the Board was not required to create a new ESY program specifically for A.L. Accordingly, the district court properly gave deference to the findings of the ALJ and concluded that the Board met the requirements of 34 C.F.R. § 300.106 by assigning A.L. to the Alternative School. The order of the district court is therefore affirmed in this regard.

## B. **Appellants' Non-IDEA Claims**

## 1. Fourth Amendment Claim

Appellants also contend that A.L.'s Fourth Amendment rights were violated when he attended the Alternative School during the summers of 2008 and 2009. They claim that the searches that A.L. was required to endure each day to receive ESY services were not justified because the school had no reason to suspect A.L. of any rule violation and because he was not a security risk.

Although we agree that the district court correctly denied Appellants' motion for summary judgment with respect to the Fourth Amendment claim, we cannot agree, on this record, that summary judgment was correctly granted in favor of the Board.

In seeking summary judgment on the Fourth Amendment claim, the Board noted that Appellants' sole allegation with respect to this claim was that A.L. "was assigned by [the Board] to the Jackson County District's Alternative School, where [the Board] physically search[ed] his body and possessions daily as a condition of receiving extended year services for the summer 2009, in violation of the Fourth Amendment." The Board argued that, beyond this conclusory allegation, Appellants had failed to present any evidence establishing that A.L. or his possessions were physically searched at all. It further contended that Appellants had failed to introduce any conduct that suggested that an analysis under the Fourth Amendment was necessary.

19

In granting the Board's motion for summary judgment on the Fourth Amendment claim, the district court concluded that Appellants had "not produced any additional evidence relating to the searches beyond the description in the ALJ's factfindings."  In the district court's view, Appellants had offered "no evidence whatsoever" beyond the vague descriptions in the administrative record, which did not even consider Fourth Amendment issues.  The district court determined, based on this limited evidence, that no reasonable jury could conclude that these searches violated the Fourth Amendment.

While we acknowledge that Appellants failed to respond timely to the Board's motion for summary judgment, the district court stated that it would consider Appellants' own motion for partial summary judgment to be a response. The district court is correct that the motion alleged in general terms that the searches were "routine and were administered to every person" entering the school. But following this generic description, Appellants also cited two portions of the administrative transcript that provide further detail regarding the searches.  For instance, Ashley McDonald, who was A.L.'s teacher while he attended the Alternative School in 2009, testified that she was required to search A.L. by patting him down from his knees to his feet.  McDonald further testified that she checked A.L.'s pockets and placed her hands on his sides because she searched all of the students as they entered the classroom.  Finally, McDonald agreed that she

20

did not have any information that suggested that A.L. was a safety risk but said that she conducted the search because he "was entering my classroom," and "[w]e do it for all students, for the safety of the students."

Based on this testimony, we disagree with the School Board's contention—as set forth in its motion for summary judgment—that Appellants failed to present any evidence establishing that A.L. was physically searched when he received ESY services in 2009. The fact that A.L. was searched when he attended the Alternative School, however, does not require a finding that the Board violated A.L.'s Fourth Amendment rights. Rather, the Supreme Court has established a two-part test to determine whether a search conducted on school grounds violates a student's Fourth Amendment rights. *See New Jersey v. T.L.O.*, 469 U.S. 325, 341, 105 S. Ct. 733 (1985).

Determining the reasonableness of the search involves the following inquiry: First, the court must decide "whether the . . . action was justified at its inception." *Id.* (citation omitted). Second, the court must determine whether the search, as conducted, "was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (citation omitted). Typically, a search of a student by a teacher will be justified at its inception when reasonable grounds exist to suspect that the search will turn up evidence that the student has violated or is violating either the rules of the school or the law. *Id.* The search will be

21

permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction." *Id*.

Here, as the party seeking summary judgment on Appellants' Fourth Amendment claim, the Board was required to show either that A.L. was not searched at all or that he was searched but the search was justified at its inception and reasonable such that no reasonable jury could find that the searches were unconstitutional. In the underlying proceedings, the Board asserted only that A.L. had not presented any evidence of a search. It did not discuss whether the School Board met the two-pronged analysis of *T.L.O*.

We recognize that a finding of individualized suspicion may not be necessary when a school conducts a search, *see Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cty. v. Earls*, 536 U.S. 822, 830, 122 S. Ct. 2559 (2002), and here, unlike in other cases, a more invasive search—such as a strip search— did not occur. *See e.g., Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 129 S. Ct. 2633 (2009); *Jenkins v. Talladega City Bd. of Educ.*, 115 F.3d 821 (1997). But justification for the Board's search is required in the first instance under *T.L.O*. *See Safford*, 557 U.S. at 373 n.3, 29 S. Ct. at 2641. The district court did not engage in this analysis, so we remand to the district court for further consideration of Appellants' Fourth Amendment claim.

22

**2. Section 504 and ADA Discrimination and Retaliation Claims**

### a. The District Court Properly Dismissed Appellants' Section 504 and ADA Claims that Accrued Prior to November 24, 2008

In the proceedings below, the ALJ struck Appellants' Section 504 and ADA claims that arose before November 24, 2008, finding no jurisdiction. The ALJ noted that the IDEA has a two-year statute of limitations, 20 U.S.C. § 1415(b)(6)(B), and Appellants first filed their complaint on November 24, 2010. Accordingly, the ALJ struck allegations relating to alleged violations that occurred more than two-years prior to the filing of the complaint—November 24, 2008.

Following the ALJ's denial of their claims, Appellants filed a complaint in federal court. Various iterations of the complaint alleged violations of the IDEA, Section 504, and the ADA that predated November 24, 2008. The Board filed a motion to dismiss these claims, and the district court granted the relief sought. In its order, the district court noted that in order to successfully bring their claims, Appellants were first required to exhaust them in state administrative proceedings. The district court emphasized that Appellants' claims were stricken from the administrative hearing because they were outside the two-year statute of limitations. Consequently, the district court dismissed these claims from the complaint.

Appellants contend that the district court improperly dismissed their Section 504 and ADA claims on failure-to-exhaust grounds. We lack jurisdiction to reach

23

the merits of this argument.  Appellants did not raise on appeal the issue that they now seek for us to determine.  Their Notice of Appeal designated only the district court's order granting summary judgment and the judgment itself.  Nowhere in the Notice of Appeal did Appellants indicate that they sought review of the district court's dismissal of the pre-November 2008 claims.  Nor did the order granting summary judgment reference any such pre-November 2008 claims.

We have determined that we lack jurisdiction to consider an appeal of an order not specifically mentioned in the appellant's notice of appeal. *See Osterneck v. E.T. Barwick Indus., Inc.*, 825 F.2d 1521, 1528-29 (11th Cir. 1987); *Pitney Bowes, Inc. v. Mestre*, 701 F.2d 1365, 1374-75 (11th Cir. 1983). "We have previously concluded that, where some portions of a judgment and some orders are expressly made a part of the appeal, we must infer that the appellant did not intend to appeal other unmentioned orders or judgments." *Osterneck*, 825 F.2d at 1529. Consequently, we lack jurisdiction to review the district court's dismissal of claims as indicated in its September 26, 2013, and November 5, 2013, orders.

### b. The District Court Did Not Err When It Granted Summary Judgment in Favor of the Board on Appellants' Section 504 and ADA Claims

Appellants claim that the district court erred when it granted summary judgment in favor of the Board on their Section 504 and ADA claims.  We disagree.  In granting summary judgment in favor of the Board on the Section 504

24

and ADA counts, the district court emphasized that Appellants had not briefed the issues at all or defended their claims. The district court concluded that Appellants' claims failed for three reasons. First, it held the claims waived because Appellants failed to brief them or respond to the Board's motion for summary judgment. Second, the court noted that Appellants never brought to its attention any evidence supporting the claims. Third, the court found no factual basis for any alleged misconduct by the Board under either Section 504 or the ADA.

On appeal, Appellants concede that they failed to identify any disputed facts in response to the Board's motion for summary judgment. But, they state "that doesn't mean that there is not sworn testimony and exhibits in the record that the District Court was required to fully review under the IDEA, that prove that disputed facts exist." In short, Appellants suggest that the court was required to comb through the record and make Appellants' arguments for them. We disagree.

Rule 56(c)(3), Fed. R. Civ. P., makes clear that the district court need not consider materials not cited by the parties. As the Advisory Committee notes state, subsection (c)(3) acknowledges that district courts may decide a motion for summary judgment "without undertaking an independent search of the record." *See* Fed. R. Civ. P. 56(c)(3) Advisory Committee's Note on 2010 Amendment. We, ourselves, have also acknowledged that district courts are not required to "mine" the record looking for evidence not presented by the parties. *See Chavez v. Sec'y*

*Fla. Dept. of Corr.*, 647 F.3d 1057 (11th Cir. 2011).  Indeed, we have cited with approval the Seventh Circuit's memorable quote that appellate judges "are not like pigs, hunting for truffles buried in briefs."  *Id.* (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991).  "Likewise, district court judges are not required to ferret out delectable facts buried in a massive record. . . ."  *Id.*

We agree with the district court that Appellants waived their claims by failing to brief them, failing to respond to the Board's motion for summary judgment, and failing to bring to the court's attention evidence that supported their claims.  Nor was the district court somehow obligated to do Appellants' job for them.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

To the extent that Appellants suggest that it may rely on its pleadings to avoid judgment against it, we disagree.  "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."  *See id.*  Similarly, to the extent that Appellants seek to rely on evidence produced with respect to the IDEA claims to support their Section 504 and ADA claims, the claims fail for the same reason that their IDEA claims could not succeed.  *See Weiss by Weiss v. Sch. Bd. of Hillsborough Cty.*, 141 F.3d 990, 998 (Section 504 claim was essentially the same as IDEA claim and failed for the same reasons that the IDEA claim failed).  We

26

therefore affirm summary judgment in favor or the School Board with respect to Appellants' Section 504 and ADA claims.

## C.  Appellants' Miscellaneous Claims on Appeal

### 1.  The IDEA Does Not Require the Board to Furnish Appellants With Electronic Transcripts of All Hearings

During the course of the proceedings, Appellants filed a motion to compel seeking to require the Board to provide a court reporter for all hearings in the matter.  On appeal, Appellants claim that the ALJ erred in denying the motion to compel.  We find that the ALJ did not err in denying the motion to compel and the district court did not abuse its discretion in approving the ALJ's decision.

20 U.S.C. § 1415 ensures that children with disabilities and their parents are guaranteed procedural safeguards regarding the provision of a FAPE.  *See* 20 U.S.C. § 1415(a).  With respect to hearings, 20 U.S.C. § 1415(h) provides, in relevant part as follows:

> (h)  Safeguards.  Any party to a hearing conducted pursuant to subsection (f) or (k), or an appeal conducted pursuant to subsection (g), shall be accorded—
>
> ***
>
> (**3**) the right to a written, or, at the option of the parents, electronic verbatim record of such hearing. . . .

20 U.S.C. § 1415(h) (emphasis added).  Subsection (f), to which § 1415(h) refers, provides for an impartial due-process hearing.  Significantly, all references to this

27

type of due-process hearing are in the singular, not the plural. *See* 20 U.S.C. § 1415(f)(1)(A) ("the parents . . . shall have *an* opportunity for *an* impartial due process hearing. . . .") (emphasis added); 20 U.S.C. § 1415(f)(1)(B)(i) ("Prior to the opportunity for *an* impartial due process hearing . . .") (emphasis added); 20 U.S.C. § 1415(f)(1)(B)(ii) ("If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, *the* due process hearing may occur. . .") (emphasis added). We agree with the ALJ's conclusion that the context of § 1415(f) refers to the due-process hearing as being held at a single point in time. Accordingly, the Board is responsible for providing a record of only that final hearing and not all preliminary hearings leading up to the due-process hearing.

The relevant portions of the Florida Administrative Code support this conclusion. Rule 6A-6.03311(9)(v) of the Florida Administrative Code, provides, in relevant part, that a party to a due-process hearing has the right to "obtain written, or at the option of the parents, electronic verbatim record of *the* hearing at no cost to the parents." *Id.* (emphasis added). Like the statutory provision, this section requires a transcript of the final hearing, not all hearings conducted leading up to the final due-process hearing.

Also noteworthy is the fact that Rule 6A-6.03311(9)(v) explicitly states that an ALJ shall conduct hearings in accordance with the Uniform Rules of

Administrative Proceedings, Chapter 28-106 F.A.C.  Florida Administrative Code

Rule 28-106.214(1) states,

> Responsibility for preserving the testimony at *final* hearings shall be that of the agency transmitting the petition to the Division of Administrative Hearings pursuant to Sections 120.569 and 120.57, F.S., the agency whose rule is being challenged, or the agency whose action initiated the proceeding.  Proceedings shall be recorded by a certified court reporter or by recording instruments.

Fla. Admin. Code R. 28-106.214 (emphasis added).  This rule supports the ALJ's

conclusion that the agency is responsible for preserving the testimony only at *final*

hearings and not all hearings.  It is also consistent with the language of 20 U.S.C. §

1415(h)(3) and Florida Administrative Code Rule 6A-6.033111(9)(v)1.d.

In short, the Board was not required to provide transcripts of all hearings—

including preliminary hearings—conducted in this matter.

### 2.   The District Court Did Not Abuse Its Discretion When It Refused to Grant Appellants' Final Motion for Extension of Time

Finally, we reject Appellants' argument that the district court abused its

discretion when it denied their counsel's final request for an extension of time to

file a response to the Board's motion for summary judgment and to amend their

own dispositive motion.  We review the court's denial for an abuse of discretion,

and we give the district court "considerably more leeway than if we were

reviewing the decision de novo."  *Young v. City of Palm Bay, Fla.*, 358 F.3d 859,

29

863 (11th Cir. 2004) (citation omitted). On this record, we cannot say that the district court clearly erred in denying Appellants' final motion for extension of time. When it denied Appellants' request, the district court had already given numerous extensions and warned Appellants repeatedly that it would grant no further extensions of time.

This situation is similar to the one in *Young*. As we explained there,

> In the courts, there is room for only so much lenity. The district court must consider the equities not only to plaintiff and his counsel, but also to the opposing parties and counsel, as well as to the public, including those persons affected by the court's increasingly crowded docket. Counsel must take responsibility for the obligations to which he committed and get the work done by the deadline. . . . Deadlines are not meant to be aspirational; counsel must not treat the goodwill of the court as a sign that, as long as counsel tries to act, he has carte blanche permission to perform when he desires. A district court must be able to exercise its managerial power to maintain control over its docket.

*Young,* 358 F.3d at 864 (citation omitted).

Like in *Young*, here, the district court granted five requests for extensions with respect to Appellants' filing of their own motion for summary judgment. The district court also granted extensions of time for Appellants to file their response to the Board's motion for summary judgment. By the time the district court denied Appellants' final request for extension of time, three months had elapsed since the original deadline to file dispositive motions.

30

While we acknowledge that counsel for Appellants repeatedly expressed to the district court the need for additional time due to an alleged mental disability, we find that the district court was very reasonable in granting numerous extensions. Moreover, although Appellants failed to file a timely response to the Board's motion for summary judgment, the district court construed Appellants' own motion for partial summary judgment as a response. Finally, while we are sympathetic to counsel, the Rules of Professional Conduct require a lawyer to decline or terminate representation if the "lawyer's physical or mental condition materially impairs the lawyer's ability to represent the client[.]" *See* R. Regulating Fla. Bar 4-1.16(a). Here, if counsel for Appellants was unable to adequately represent her clients, she had a duty to terminate the representation.

In light of the multiple extensions of time and warnings provided, the district court did not abuse its discretion when it refused to grant Appellants' final motion for extension of time.

## V.

For the reasons discussed above, we reverse and remand with respect to Appellants' Fourth Amendment claim. We affirm the judgment of district court with respect to all other claims.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**